**UNITED STATES of America, Appellee,**

v.

**Willard R. SANDERS, Appellant.**

**No. 79–1661.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 7, 1979.

Decided Aug. 15, 1980.

Rehearing En Banc Denied Sept. 22, 1980.

---

John D. Hudson, Des Moines, Iowa, for appellant.

Don C. Nickerson, Asst. U.S. Atty., Des Moines, Iowa, for appellee; Roxanne Barton Conlin, U.S. Atty., Des Moines, Iowa, on brief.

Before GIBSON, Chief Judge,[*] and LAY and McMILLIAN, Circuit Judges.

FLOYD R. GIBSON, Senior Circuit Judge.[*]

Willard R. Sanders appeals his conviction pursuant to a jury verdict finding him guilty of narcotics distribution in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1976). We affirm.

On October 2, 1978, a United States Drug Enforcement Agency (DEA) agent, Overbaugh, filed a complaint against Sanders. After a preliminary hearing on October 5, before a magistrate, the complaint was dismissed for lack of probable cause. A federal grand jury, on October 25, 1978, then indicted Sanders in a two-count indictment charging violations of 21 U.S.C. §§ 841(a)(1) and 846 (1976). Count I alleged that on or about October 2, 1978, Sanders distributed twenty-two capsules of heroin. Count II alleged that from May 1, 1978, until October 2, 1978, Sanders had conspired with Rosebud Biggles knowingly and intentionally to distribute a controlled substance. The case was tried to a jury. On December 20, 1978, the jury rendered a verdict of guilty on both counts. Sanders's motion for a new trial was overruled on July 13, 1979, and on July 26, 1979, the District Court[1] sentenced Sanders to a prison term of five years and a special parole term of six years. The same sentence was imposed on both counts, to run concurrently.

On appeal, Sanders urges reversal of his conviction on the basis of four arguments:

(1) the trial court erred in admitting as evidence the contraband seized on October 2, 1978; (2) the trial court erred in admitting as evidence the October 2 statement made by Sanders; (3) the trial court erred in admitting as evidence the October 25 statements made by Sanders; and (4) Sanders was denied effective assistance of counsel. The facts relevant to these arguments are set forth in our analysis of the case.

*Probable cause to arrest*

■ On October 2, 1978, DEA Agents Overbaugh and Thornton waited in a car in the vicinity of Seventeenth and Crocker, Des Moines, Iowa, in order to observe Willard Sanders and Rosebud Biggles. The agents had chosen to conduct surveillance pursuant to information received from a confidential informant that Rosebud Biggles was trafficking in heroin and cocaine, and that he obtained his drugs from Sanders at Seventeenth and Crocker, specifically at the house at 853 Seventeenth Street. The informant indicated that the drug transaction meetings often occurred around noon and provided a detailed description of Sanders's automobile, including the license plate number. The agents had received information from this informant concerning the Biggles-Sanders drug transactions on at least a dozen occasions, with the most recent tip given only three days prior to the time they conducted this surveillance. The informant had previously supplied other information and had proven reliable regarding other drug transactions. His information had led to at least six search warrants and fifteen arrests and had never been discovered to be false. The agents, who already had some acquaintance with Sanders and Biggles, were also aware of the fact that in 1971 Sanders had been convicted of distributing heroin in an incident connected with Rosebud Biggles.

From a distance of approximately one-and-one-half to two blocks, at about 12:45 p.

---

* The Honorable Floyd R. Gibson was chief judge of the Eighth Circuit at the time this appeal was heard; Judge Gibson assumed senior status on December 31, 1979; The Honorable Donald P. Lay is now chief judge of the Eighth Circuit.

1. The Honorable William C. Stuart, Chief Judge, United States District Court, Southern District of Iowa.

m., the agents observed Biggles walk behind the 853 Seventeenth Street residence to an area where a door is located. Approximately five minutes later, 12:50 p. m., Biggles and Sanders walked from the house, crossed the street together, and entered Sanders's vehicle. Sanders occupied the driver's seat, and Biggles took the passenger seat.

After observing the subjects in the automobile for approximately one minute, without seeing anything happen in the Sanders vehicle, the agents drove their vehicle from their surveillance position to a position in front of Sanders's automobile. Agent Overbaugh then approached the passenger side of the Sanders vehicle and noticed Biggles make a furtive movement with his right hand from the area of his shirt pocket to the floor of the car in the area around his feet. Agent Overbaugh also noticed that Biggles had an excited facial expression. Immediately after this, the agents announced their identity as federal agents, and Thornton, who was approaching the driver's side, flashed his gold shield badge to Sanders.

At this point, we find that the federal agents had probable cause to arrest both Sanders and Biggles, or at minimum had a strong and reasonable suspicion that they were engaged in criminal activity.[2]

[P]robable cause to arrest exists when an officer personally knows or has been reliably informed of sufficient facts to warrant his belief that a crime has been committed and that the person who is to be arrested committed it. *United States v. Stevie,* 578 F.2d 204, 208 n.4 (8th Cir. 1977), *aff'd on rehearing en banc,* 582 F.2d 1175 (1978), *cert. denied,* 443 U.S. 911, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979). * * * When independent sources corroborate the information supplied by the informant, there is probable cause for the arrest. *United States v. Bazinet,* 462 F.2d 982, 988 (8th Cir.), *cert. denied,* 409 U.S. 1010, 93 S.Ct. 453, 34 L.Ed.2d 303 (1972). Here, the facts known to the arresting officers plus the information by the informant constituted probable cause.

*United States v. Luschen,* 614 F.2d 1164, 1171–72 (8th Cir.), *cert. denied,* 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980).

Agents Thornton and Overbaugh had probable cause to arrest Sanders and Biggles. A reliable informant had provided information, giving the agents a reasonable suspicion that the meeting between Sanders and Biggles involved distribution of narcotics. Their personal observation of the meeting partially corroborated the information provided by the confidential informant.[3] Effective law enforcement required them to follow up on this suspicion. As the agents approached Sanders and Biggles, the furtive movement of Biggles and his contemporaneous facial expression further corroborated the information provided by the informant,[4] and the totality of information

---

**2.** The District Court found that these circumstances presented adequate grounds for an investigative stop of the nature endorsed in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Terry* permits law enforcement officials, without a warrant, to conduct a limited investigation if, on the basis of specific and articulable facts, they acquire a reasonable suspicion that a crime is being committed. *See also Pennsylvania v. Mimms,* 434 U.S. 106, 110–12 & n.5, 98 S.Ct. 330, 333–334, 54 L.Ed.2d 331 (1977) (reasonable to order occupants from car and conduct limited weapons search). We agree with the District Court that the stop was justified on this basis, but we additionally hold that the agents were correct in believing that they had probable cause to arrest as their basis for the stop.

**3.** As stated in *United States v. Gonzalez,* 555 F.2d 308, 313 (2d Cir. 1977): "The corroborat-

ing evidence need not, of course, establish the crime itself; corroboration of even innocent elements is enough." *See also United States v. Dien,* 609 F.2d 1038, 1043 (2d Cir. 1979), *reheard* 615 F.2d 10 (2d Cir. 1980) (adhered to previous decision).

**4.** As stated in *Sibron v. New York,* 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904–05, 20 L.Ed.2d 917 (1968):

[D]eliberately furtive actions * * * at the approach of strangers or law officers are strong indicia of *mens rea,* and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest. *Brinegar v. United States,* 338 U.S. 160, [69 S.Ct. 1302, 93 L.Ed. 1879] (1949); *Husty v. United States,* 282 U.S. 694, [51 S.Ct. 240, 75

then known to the agents served to establish probable cause to make an arrest. *See Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

*Seizure of the packet of heroin*

After Sanders and Biggles were removed from the car, Agent Overbaugh searched the person of Rosebud Biggles while Agent Thornton searched Sanders. Agent Thornton's search of Sanders revealed no narcotics or weapons, but Thornton did discover some "personal stuff," a billfold and a small amount of cash. Agent Overbaugh testified that he basically conducted a frisk for weapons. He recovered a notebook and $1,053 in cash from Biggles, then instructed Biggles to keep his hands on the roof of the automobile. At this point the door to the passenger side of the vehicle remained open, and Biggles, with his hands on the roof, stood just to the left of the door.

Agent Overbaugh then looked into the car and observed, on the passenger side floorboard, a small brown packet. The earlier hand movement of Biggles had prompted Agent Overbaugh to look into the car and directed his viewing. Overbaugh reached in the car, picked up the packet and, examining it, found it to contain twenty-two capsules of brown powder. At this point, Overbaugh placed Biggles under arrest for violating narcotics laws. Overbaugh advised Biggles of his constitutional rights, and asked Sanders if he would accompany the party to the courthouse. The agents seized the car, and escorted Sanders and Biggles to the United States Courthouse.

We find that the seizure of the heroin without a warrant was constitutionally permissible. Based upon reasonableness, the United States Supreme Court has approved a number of carefully crafted exceptions to the fourth amendment's requirement that government seizures should be made pursuant to a search warrant.[5] Three exceptions have possible relevance to the facts of this case: (1) a search incident to an arrest; (2) the plain view doctrine; and (3) the special rules applicable to automobiles.[6] The law enforcement procedures employed by Overbaugh and Thornton were completely reasonable and justified by the circumstances.

After the agents determined that they had probable cause to arrest Biggles and Sanders, the agents ordered them to leave their vehicle and searched their persons. The search was conducted within the immediate vicinity of the vehicle, and the floorboard of the car was within the area of Biggles's immediate control from which he might have gained a weapon or destructible evidence. After the quick sequence of events whereby the agents secured control of Biggles and Sanders and the contraband, Overbaugh formally informed Biggles that he was being placed under arrest and read him his *Miranda* rights.

The seizure of the heroin can be justified as resulting from a search incident to an arrest. The search and seizure of the packet of heroin was substantially contemporaneous with the arrest, and the floorboard of the car was potentially available to Biggles. *See Chimel v. California*, 395 U.S. 752, 763,

---

L.Ed. 629] (1931); see *Henry v. United States*, 361 U.S. 98, 103, [80 S.Ct. 168, 171, 4 L.Ed.2d 134] (1959).

5. The United States Constitution, Article IV, states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

6. *See, e. g., Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v.*

*United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Because of the confusion regarding the automobile exception, *see Arkansas v. Sanders*, 442 U.S. 753, 768, 99 S.Ct. 2586, 2595, 61 L.Ed.2d 235 (Burger, C. J., concurring in the judgment); *id.* at 768–72, 99 S.Ct. at 2595–2597 (Blackmun, J., dissenting), and because the importance of the automobile involved in this case appears minimal, we need not address the issue of whether the situs of the contraband within the vehicle created an exigent circumstance permitting the seizure of the contraband to preclude the possibility of its removal or destruction.

89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). *Cf. Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (limited weapons search appropriate after *Terry* stop).

Even if the packet on the floorboard were considered slightly outside the area under the immediate control of the arrestee, Biggles, plain view of the packet was obtained in the course of an appropriately limited search of the arrestee. *See Coolidge v. New Hampshire*, 403 U.S. 443, 465–66 n.24, 91 S.Ct. 2022, 2037–2038, 29 L.Ed.2d 564 (1971). The District Court thus properly relied upon the plain view doctrine to uphold the seizure of the packet.

 As this court observed in *United States v. Johnson*, 541 F.2d 1311, 1316 (8th Cir. 1976), the requirements for relying upon the plain view exception are: (1) the article discovered was in plain view; (2) the discovery resulted from a legally justified intrusion; (3) the discovery was inadvertent; and (4) the incriminating nature of the article was immediately apparent. All parties concede that the packet was within the plain view of Agent Overbaugh. Since he had probable cause to arrest Biggles and Sanders, or at the very least had the right to make a limited stop under *Terry*, it cannot be said that Overbaugh was not legitimately in a position to view the evidence. We therefore need deal only with appellant's challenges based upon the latter two requirements.

Appellant contends that discovery of the heroin cannot be considered inadvertent because the informant's information had led the agents to suspect that a heroin transaction was taking place. He contends that permitting the seizure of the packet unjustifiably allows circumvention of the warrant requirement. Appellant makes this argument, even though he strenuously asserts that the informant was insufficiently reliable to provide probable cause.

 Appellant's argument regarding the requirement of inadvertency cannot be countenanced. On the one hand, he argues that drug transactions of this nature function routinely and like precise clockwork, and if agents once observe a drug deal pursuant to an informant's information they should be required to bide their time, seek a warrant, and return at the next appointed time and place where they believe a drug deal will be made. On the other hand, appellant recognizes that the informant's information, by itself, may not have provided probable cause, and that until the time when the agents observed sufficiently corroborating material to create probable cause for an arrest, the activities of the agents can be characterized only as investigation of an informant's tip. In our view, once the investigation provided probable cause to believe that the agents were observing the commission of a crime, they were not required to ignore the activity and seek a search warrant. The inadvertency requirement's purpose is to deter planned warrantless seizures not based upon exigent circumstances. The requirement is not met when law enforcement officials "know in advance they will find [the evidence] in plain view and intend to seize [it.]" *Coolidge v. New Hampshire*, 403 U.S. 443, 471, 91 S.Ct. 2022, 2041, 29 L.Ed.2d 564 (1971). It is inapplicable to the situation at bar, where by surveillance pursuant to a tip the agents determined that they had probable cause to arrest for the commission of a crime currently in progress before them.

Appellant argues that the incriminating nature of the packet could not be ascertained without examining its contents and viewing the capsules of heroin. We reject this argument because we find that the incriminating nature of the brown packet was immediately apparent to the DEA agent. The informant had specifically indicated that Sanders and Biggles dealt with cocaine and heroin. This information, plus Agent Overbaugh's personal observation of Biggles, the training and experience of the agents, and the particular physical characteristics of the packet[7] created a reasonable

---

7. After the Supreme Court's decision in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476,

53 L.Ed.2d 538 (1977), courts have found it necessary to pay close attention to the details

inference that the packet contained the contraband.

The situation is analogous to that in *United States v. Blake*, 484 F.2d 50 (8th Cir. 1973). In *Blake* we found that the cumulative facts of the case would have led a reasonable person to believe that a particular purse probably contained contraband. This, plus the fact that a white plastic bag, known to be a common item in narcotics distribution, protruded one-and-a-half inches outside of the closed purse, sufficed to establish the incriminating nature of the evidence, justifying both the seizure of the purse and the opening of it to find the heroin within the white plastic bag. 484 F.2d at 57. The plain view doctrine did not require Agent Overbaugh to have absolute proof of the incriminating nature of the packet; otherwise even the sight of the capsules would have been insufficient because only a laboratory analysis could prove that they contained heroin. Given the totality of the circumstances, it was immediately apparent to Overbaugh that the packet appeared to contain contraband.

The District Court did not err in denying appellant's motion for suppression of the heroin as evidence.

*Voluntary statements*

After arrival at the courthouse, Sanders was asked if he wished to give a statement. He agreed, and Agent Overbaugh read him a statement of his constitutional rights and Sanders read the statement-of-rights form. Sanders indicated he understood his rights and waived them. He then supplied a voluntary statement prior to the agents' making any decision regarding whether to file a complaint. Overbaugh then filed a complaint against Sanders and advised Sanders that he would have to appear before the magistrate. On October 3, 1978, Agent Thornton spoke with Sanders about the possibility of Sanders assisting with the investigation in terms of providing more than just general information. Sanders had replied that he was going to investigate the narcotics seized on October 2 and provide assistance.

Following the return of a federal grand jury indictment on October 25, 1978, Overbaugh and Thornton arrested Sanders. At the time of his arrest, they did not again advise him of his constitutional rights, but they did not question him. As they transported him to the Polk County jail, Sanders volunteered the statement, "You know that dope—that drug was in capsules, and you can't get those capsules in the Des Moines, Iowa, area."

During trial, Sanders objected to the admission into evidence of his written statement of October 2, 1978, on the grounds of relevancy, and objected to the testimony of Agent Thornton relating Sanders's state-

---

of the physical description of containers that have been opened by law enforcement agents without a warrant. In *United States v. Ross*, No. 79–1624 (D.C.Cir., Apr. 17, 1980), a panel of the United States Court of Appeals for the District of Columbia Circuit considered the difficult question of whether opening a paper bag by the police constituted an illegal warrantless search. Addressing the issue of how to determine whether an expectation of privacy attends a particular container, the court catalogues various types of containers. *Id.* at 9–13 and nn. 3 and 4. An examination of this catalogue and a reading of Judge Bazelon's separate opinion concurring in part and dissenting in part highlight the difficulty of making the determination required by *Chadwick* and *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). In this case, however, the physical attributes of the brown packet and the circumstances under which it was perceived render it unnecessary for us to delve deeply into the question of whether it was "inevitably associated with the expectation of privacy,"

*Arkansas v. Sanders, supra,* 442 U.S. at 762, 99 S.Ct. at 2592.

The packet, approximately 2½ by 3 inches, was constructed from heavy, manila-colored paper and appeared well-used. A part of it had been torn off and the record does not indicate that Agent Overbaugh had to unseal or tear the packet to look inside. The record implies the contrary. Appellant does not in fact argue that an expectation of privacy attended the packet; he limits his argument to contending that the incriminating nature of the packet was not immediately apparent. The District Court's conclusion to the contrary, however, cannot be considered clearly erroneous. The contents of the packet could easily be inferred from its outward appearance and the surrounding circumstances. The agents knew that heroin or cocaine is frequently carried in small packets of this nature. Biggles's furtive movement indicated the size and placement of the contraband and further corroborated the information already known to the agents suggesting that Biggles and Sanders were engaged in a narcotics sale.

ment made while he was being transported to jail.

Sanders objects on appeal to the admission of the two statements into evidence, on the basis that they were fruits of an illegal arrest and that the statement made during transportation to the jail was not voluntary because it was the product of custodial interrogation and he had not intelligently or voluntarily waived his rights under the fifth and sixth amendments and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ While we note that Sanders may not have preserved for appeal the issues he now raises, we find the merits of his arguments unpersuasive.[8] As we have already determined that the agents had probable cause to arrest Sanders on October 2, his statement made on that date cannot be considered the fruit of an illegal arrest, and prior adequate *Miranda* warnings were given. Admission of the October 25 statement was appropriate because the facts established the voluntary nature of the statement. Agent Overbaugh fully informed Sanders of his rights on October 2, after which Sanders indicated that he wished to waive them. At the time of his arrest, the agents did not question him or in any way attempt to elicit information from him. Although Agent Thornton had spoken with him on October 3 regarding the possibility of assistance, this conversation does not present sufficient evidence of any semblance of pressure or coercion or lack of voluntariness of the October 25 statement. *See United States v. Grant*, 622 F.2d 308 at 316–317 (8th Cir. 1980).

■ The recent United States Supreme Court decision in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), compels rejection of appellant's argument that the statement made during transportation to the jail should have been suppressed because the agents did not read

him his *Miranda* rights after taking him into custody. The Court stated:

> This is not to say, however, that all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation. * * * It is clear therefore that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody but rather where a suspect in custody is subjected to interrogation. "Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

446 U.S. at 299, 100 S.Ct. at 1689. (footnote omitted). The circumstances of this case do not suggest that Sanders was subjected to any compulsion. His prior conversation with Agent Thornton twenty-two days earlier cannot be considered within the realm of coercive police practices designed to elicit an incriminating response from a suspect in custody. Sanders's statement of October 25 clearly falls into the category of an unsolicited voluntary remark made while in custody but not while under interrogation.

*Effective assistance of counsel*

■ Appellant contends that he was denied effective assistance of counsel because his retained attorneys failed adequately to investigate the case prior to the trial. The District Court conducted a hearing on these charges and determined that they were without merit. A careful review of the records reveals no reason to disturb this finding. Appellant has not shown that he was "materially prejudiced in the defense of his case by actions or inactions of defense counsel" or that "his attorney failed to exercise the customary skills and diligence that a reasonably competent attorney would perform under similar circumstanc-

---

**8.** The Government argues that appellant did not raise these issues at the trial level and therefore we should not consider them for the first time on appeal. *United States v. Librach*, 536 F.2d 1228, 1231 (8th Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976).

We do not wish to imply condonation of this practice, but review is always appropriate under the plain error rule of Fed.R.Crim.P. 52(b), and addressing these issues may aid a principled disposition of similar claims.

es." *Morrow v. Parratt*, 574 F.2d 411, 412–13 (8th Cir. 1978).

*Conclusion*

Judgment affirmed.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent.

In affirming this conviction the majority gives great deference to the law enforcement goals of the DEA agents, so much so that I fear scrutiny has been diverted from the means used by Agents Thornton and Overbaugh to achieve those goals. The desirability of the agents' goals is unquestionable: they intercepted illegal drugs and apprehended one man who was in possession and another who was later convicted of distributing them. But, as the majority recognizes, the agents could only accomplish this goal by arresting appellant and seizing objects found in his car. The majority offers two rationales for this arrest and search: (1) There was probable cause for arresting appellant on October 2, 1978, and the search was incident to the arrest to protect the officers and prevent evidence from being destroyed. Yet a magistrate who reviewed the evidence against appellant found no probable cause shortly after the arrest; the court below agreed, and the government on this appeal conceded the absence of probable cause.[1] (2) The agents had the right to make at least a limited investigatory stop of the car (whether on the basis of probable cause or reasonable suspicion) and saw the incriminating evidence in plain view.[2] But all the agents

saw after they looked into appellant's car was a small plain manila envelope—hardly contraband in plain view. Even the envelope was not seen until the agents looked purposefully into appellant's car.

In my view the majority waters down the requirement of probable cause for arrest to a requirement of mere suspicion. By approving a search on mere suspicion of a car and an innocent looking envelope in the car, the majority's plain view approach eviscerates the requirement of probable cause for a search. Thus, in my view, the affirmance results from an undue deference to the legitimacy of the law enforcement goals which motivated the agents as they approached appellant's car and from an unfortunate disregard for constitutional limits on the means used by the agents to achieve those goals.

The majority's probable cause discussion reflects this emphasis on law enforcement purposes. The agents learned of drug transactions between Biggles and Sanders from an anonymous informant's repeated tips, the latest received three days before the seizure of the drugs on October 2. Although the informant's credibility is unchallenged, the record does not reveal the circumstances which led the informant to conclude that a drug transaction would take place at the predicted time or location or between the named participants. Instead, the informant merely told the officers that at a given time of day two men would emerge from a particular building and proceed to a car, where they would conduct a

1. On October 2, 1978, the agents stopped appellant's car and found on the floor a brown envelope containing narcotics which had been dropped by appellant's associate Biggles; the same day the agents filed a criminal complaint against appellant. Magistrate R. E. Longstaff of the Southern District of Iowa dismissed the complaint on October 5 for lack of probable cause. (Magistrate Longstaff did so even though presented with evidence of the narcotics found in appellant's car; the majority holds the agents had probable cause to arrest appellant even before they had discovered the narcotics.) At trial the district court concluded that probable cause did not exist at the time the agents approached appellant's car. At oral argument before this court, the government

conceded that there was no probable cause at the time the car was approached, and in its brief the government states flatly that there was "no probable cause to arrest [appellant]."

2. The majority relies upon this "plain view" theory to support the seizure of the narcotics from appellant's car and introduction of the narcotics into evidence, but not to support the arrest of appellant and introduction of his post-arrest statement into evidence. The majority relies only upon an arrest with probable cause to support introduction of appellant's October 2 statement. At 1316. As explained below, I regard both the October 2 and October 25 statements of appellant as fruits of an unlawful arrest.

drug transaction. The agents knew that the two men, Biggles and appellant, had been involved in a single narcotics transaction seven years earlier that resulted in a conviction of appellant for distribution of narcotics. The majority concludes that, once the agents confirmed by surveillance that the meeting took place at the location and in the automobile described by the informant and once the agents observed Biggles's excited expression and his "furtive" gesture in throwing a small envelope to the floor as they approached the car, the agents had "sufficient facts to warrant [the] belief that a crime ha[d] been committed and that the person[s] who [were] to be arrested committed it." At 1312, *citing United States v. Luschen*, 614 F.2d 1164, 1171 (8th Cir.), *cert. denied*, 436 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980) (a case in which the DEA agents had observed firsthand some of the criminal activity which created the probable cause for arrest). Relying on *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), the majority concludes that the confirmation of innocent details from the informant's tip established probable cause for arrest of appellant as well as Biggles, even if the agents did not know what led the informant to put the finger on their meeting.

I cannot read *Draper* so broadly as to support probable cause in these circumstances. *See generally* LaFave, *Probable Cause from Informants*, 1977 U. OF ILL. L.F. 1. An informant's tip can create probable cause for arrest or search only on some showing *both* of likely reliability *and* of some circumstances upon which the tip was based. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *United States v. Neumann*, 585 F.2d 355, 357–58 (8th Cir. 1978). The reason for considering the circumstances upon which the tip was based is that probable cause must be based upon something more definite than suspicions of an informant or "rumors of the illegal activity." *United States v. Fox*, 606 F.2d 231, 233 (8th Cir. 1979) (per curiam). Indeed, probable cause must be based upon something more than the mere suspicion of expe-

rienced law enforcement officials. *Aguilar, supra*, 378 U.S. at 112–14, 84 S.Ct. at 1512–1514. *See United States v. Deggendorf*, 626 F.2d 47 at 52 (8th Cir. 1980). In my view, to allow police to arrest individuals upon mere suspicion opens the door to the worst sort of discriminatory abuse of police power. *E.g., United States v. Ardle*, 435 F.2d 861 (9th Cir. 1970), *cert. denied*, 402 U.S. 947, 91 S.Ct. 1638, 29 L.Ed.2d 116 (1971) (long hair of suspect considered as a factor giving customs agent probable cause to search for narcotics). Such latitude tempts informants "to fabricate reports of criminality in order to satisfy grudges, protect friends, or receive money payments." Rebell, *The Undisclosed Informant and the Fourth Amendment*, 81 YALE L.J. 703, 718 (1972).

Nothing in *Draper* reduces the probable cause requirement. In *Draper*, a reliable informant told police the accused had travelled to another city to obtain narcotics and would return on a train from a given place on a specific morning; the informant described in detail the outfit the accused would be wearing, the tan zipper bag he would be carrying, and the accused's gait. Although the record did not disclose how the informant came by this information, from the kind of particularized detail it could be inferred that the informant was a participant in the narcotics transaction; for example, details about clothing someone plans to wear while travelling is the sort of information a traveller provides to someone expected to meet him. In *Draper*, therefore, when the police confirmed the details of the tip, they also had some basis for inferring how the informant learned of the alleged criminal activity. *See Spinelli, supra*, 393 U.S. at 426–27, 89 S.Ct. at 594–595 (White, J., concurring). *See also Whiteley v. Warden*, 401 U.S. 560, 567, 91 S.Ct. 1031, 1036, 28 L.Ed.2d 306 (1971); *United States v. Scott*, 545 F.2d 38 (8th Cir. 1976), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 784 (1977).

By contrast, the DEA agents did not have probable cause in this case because the record discloses nothing in the informant's tip from which the agents could infer the cir-

cumstances which led the informant to believe a crime would take place. *See United States v. Williams*, 604 F.2d 1102, 1122 (8th Cir. 1979); *United States v. Bailey*, 547 F.2d 68 (8th Cir. 1976); *United States v. Wood*, 545 F.2d 1124, 1126 & n.2 (8th Cir. 1976), *cert. denied*, 429 U.S. 1098, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977). Thus, the informant's tip must be regarded as creating mere suspicion—reasonable suspicion, perhaps, because its subjects were known to have previously engaged in drug transactions. When the agents observed Sanders and Biggles come out of a building and enter a car as the informant predicted, their suspicions were prolonged. But the informant had provided no information that would suggest with any force that he knew any more about these suspicious meetings than anyone who perhaps knew about a meeting for any purpose between Biggles and appellant. "This meager [information] could easily have been obtained from an offhand remark heard at a neighborhood bar." *Spinelli, supra*, 393 U.S. at 417, 89 S.Ct. at 589. In contrast, the *Draper* informant knew things that would not be expected unless he were a participant in some endeavor with the accused. I note also that the *Draper* tip was much more detailed than the tip in the instant case. *See United States v. Mitchell*, 425 F.2d 1353 (8th Cir.), *cert. denied*, 400 U.S. 853, 91 S.Ct. 85, 27 L.Ed.2d 90 (1970). *See also United States v. Garcia*, 593 F.2d 77, 78–79 (8th Cir. 1979). The agents themselves observed no unlawful conduct and did not even see any suspicious object until after they conducted the search. *Cf. United States v. Howe*, 591 F.2d 454 (8th Cir.), *cert. denied*, 441 U.S. 963, 99 S.Ct. 2411, 60 L.Ed.2d 1069 (1979) (transfer of cigarettes observed during investigation of cigarette tax evasion); *see also United States v. Young*, 567 F.2d 799 (8th Cir. 1977), *cert. denied*, 434 U.S. 1079, 98 S.Ct. 1273, 55 L.Ed.2d 786 (1978) (informant's tip that stolen machinery would be transported across state line confirmed when FBI agents from a distance observed inside trailer driven by suspect machinery of the type stolen). Therefore, in may view the DEA agents approaching appellant's car on October 2 had only reasonable suspicion, not probable cause, to believe the subjects had committed a crime. *Cf. Johnson v. United States*, 333 U.S. 10, 15–17, 68 S.Ct. 367, 369–370, 92 L.Ed. 436 (1948) (informant's tip that opium was being smoked in hotel room confirmed by odor of opium emanating from room not adequate to support probable cause for arrest). *But see United States v. Trejo-Zambrano*, 582 F.2d 460 (9th Cir.), *cert. denied*, 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 682 (1978). *See generally Eighth Circuit Survey*, 13 Creighton L.Rev. 1091, 1307 (1980).

The only additional information the agents obtained upon approaching the car came from the "furtive" gesture[3] and excited expression of Biggles. The majority does not explain how Biggles's gesture could have given the agents probable cause

**3.** The majority relies upon *Sibron v. New York*, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904–1905, 20 L.Ed.2d 917 (1968), as authority for the proposition that "furtive actions" by a suspect may support probable cause. At 1312 n.4. In the passage from *Sibron* cited by the majority, the Supreme Court was referring to conduct of a completely different kind than a single gesture of throwing something onto the floor. The *Sibron* Court suggested in a footnote what it meant by "furtive actions" it considered supportive of probable cause. *Id.* at 66 & n.22, 88 S.Ct. at 1904 & n.22, referring the reader to n.7 in that case, which indicates what gave an off-duty policeman probable cause to arrest suspects, who were strangers the policeman saw sneaking about at the apartment where the policeman lived. The policeman had lived in the elevator-equipped building for twelve years, yet did not recognize the suspects, whom he observed through a peep hole in his door. He emerged from his apartment and slammed the door, whereupon, without further prompting, the suspects fled. The Supreme Court quoted the trial judge:

> We think the testimony at the hearing does not require further laboring of this aspect of the matter, unless one is to believe that it is legitimately normal for a man to tip-toe about in the public hall of an apartment house while on a visit to his unidentified girl-friend, and, when observed by another tenant, to rapidly descend by stairway in the presence of elevators.

*Id.* at 49 n.7, 88 S.Ct. at 1895 n.7. By contrast, in the instant case the only "furtive" gesture was a quick movement of Biggles's hand from his shirt pocket to the floor, while Biggles was sitting in a car with appellant, the car's owner.

to arrest appellant, whom the agents still merely suspect of dealing in narcotics. I doubt that Biggles's behavior would support probable cause to arrest Biggles, let alone anyone else in the car. Biggles's reaction, of course, was provoked by the appearance of the agents, who drove up suddenly, stopped directly in front of appellant's car, and approached. *Before* they identified themselves as drug agents, Biggles threw something on the floor.[4] I cannot see how this act is inconsistent with perfectly innocent behavior: for example, an attempt by the occupant of a car to conceal something valuable when approached suddenly and aggressively in what from the point of view of the occupant might be a robbery. *Cf. United States v. Wood, supra,* 545 F.2d at 1127 (during an investigative stop of a car, suspect threw some white powder out of the car which a field test showed to be cocaine; the police then had probable cause to arrest driver and search car). Absent discovery of some substantial clue pointing to a drug transaction *before* the agents approached the car, I do not think Biggles's response on their approach created probable cause. "A contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked." *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963). I would agree with the magistrate who heard the original complaint, with the trial court and with the government, all of whom thought that probable cause did not exist. Thus, the seizure of the brown "packet" was not justified as a search incident to arrest.

Likewise, I think that the majority's alternative holding, that the narcotics were in plain view when the agents approached the car, can only be supported by undue emphasis on the law enforcement goals of the agents. In my view, although the agents did not have probable cause to arrest appellant and Biggles, they did have reasonable suspicion that justified approaching the car.[5] I have difficulty, however, concluding even that the brown packet was in plain view at this time. Agent Overbaugh testified he did not see the packet when Biggles made his quick gesture to throw it down, that the packet was on the floor even with the overhang of the seat, and that he found it by looking purposefully into the car. Thus, the packet itself seems not to have been visible at all to someone standing outside the car. A purposeful search was required to observe the packet at all.

Furthermore, as the majority recognizes, the plain view doctrine applies only where "the incriminating nature of the article [seized is] immediately apparent." At 1314. *See United States v. Clark,* 531 F.2d 928, 932–33 (8th Cir. 1976); *United States v. Molkenbur,* 430 F.2d 563 (8th Cir.), *cert. denied,* 400 U.S. 952, 91 S.Ct. 244, 27

---

**4.** Agent Overbaugh testified he and Agent Thornton "drove up and parked in front of [the] vehicle. We both got out of the car, and started toward the car. *After* I saw Mr. Biggles making a movement to his shirt, [I] started yelling, "Federal agents." (emphasis added).

**5.** In such a case a limited search is permissible absent probable cause, because the law enforcement agent is entitled to take reasonable steps to protect himself and the public from violence which might result from the encounter *with those who are objects of reasonable suspicion of felonious activity. Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). Agent Overbaugh, who seized the brown pack-

et, testified that he was *not* concerned about weapons when he reached into the car; instead, he was seeking to obtain narcotics evidence. *Cf. United States v. Stevens,* 509 F.2d 683 (8th Cir.), *cert. denied,* 421 U.S. 989, 95 S.Ct. 1993, 44 L.Ed.2d 479 (1975) (search for weapon). This intrusion was clearly unjustifiable under the holding of *Sibron v. New York, supra,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917, in which the Supreme Court found unlawful absent probable cause a pat-down or frisk of a narcotics suspect by a police officer seeking to obtain narcotics evidence. *See also United States v. Williams, supra,* 604 F.2d at 1124; *United States v. Thompson,* 597 F.2d 187 (9th Cir. 1979). *Cf. United States v. Wright,* 565 F.2d 486 (8th Cir. 1977), *cert. denied,* 435 U.S. 974, 98 S.Ct. 1621, 56 L.Ed.2d 67 (1978) (approving seizure of weapon seen on front seat of auto during investigative stop).

L.Ed.2d 258 (1970). The majority further determines that in the circumstances of this case the incriminating nature of a 2½ by 3 inch, heavy manila envelope is immediately apparent. This rather surprising conclusion should give pause to anyone who, for example, uses such packets to carry valuable stamps and coins or who receives a watch back from a repair shop in such an envelope. In my view such an apparently innocent object can be considered incriminating only if we suppose that the law enforcement goal of the agents gave them a kind of x-ray vision revealing the contents of the envelope. To impute to the agents this insight into the packet's contents, the majority relies upon the legitimate goals of the agents, who did indeed *suspect* narcotics

traffic in the car, and so would also *suspect* that any suitable container found in the car, no matter how innocent in appearance, would be used for narcotics. *See* at 1314–1315 & n.7. But I do not think that the plain view doctrine allows law enforcement agents to search any container or package that seems suspicious to them.[6] *See United States v. Jackson*, 576 F.2d 749, 753 (8th Cir.), *cert. denied*, 439 U.S. 858, 99 S.Ct. 175, 58 L.Ed.2d 167 (1978). *Cf. Carpenter v. Sigler*, 419 F.2d 169 (8th Cir. 1969) (similar stop; burglary tools seen in plain view beside car seat). *See also United States v. Cornejo*, 598 F.2d 554, 556 (9th Cir. 1979) (per curiam). I therefore disagree with the conclusion that the seizure was justified under the plain view doctrine.[7] *See also*

**6.** The majority relies upon *United States v. Blake*, 484 F.2d 50 (8th Cir. 1973), *cert. denied*, 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974), to support its finding that narcotics were in plain view in this case. But the *Blake* case is distinguishable. In that case a search was made of a closed purse found lying on a floor with a white plastic bag protruding from it. The object in plain view was the purse. The court specifically stated, "we have determined that probable cause existed to believe that the purse contained narcotics." *Id.* at 57. *See also United States v. Wilson*, 524 F.2d 595 (8th Cir. 1975), *cert. denied*, 424 U.S. 945, 96 S.Ct. 1415, 47 L.Ed.2d 351 (1976). In the instant case by contrast the majority makes no finding that there was probable cause to believe that the packet contained narcotics. *Cf. Michigan v. Tyler*, 436 U.S. 499, 509–10, 98 S.Ct. 1942, 1950–1951, 56 L.Ed.2d 486 (1978) (seizure of containers of flammable liquid from burning building). The majority holds instead that plain view of the packet, plus the officers' suspicions about its contents, justified the officers in looking into the packet. The majority dismisses as insignificant the absence of probable cause by asserting, "The plain view doctrine did not require Agent Overbaugh to have absolute proof of the incriminating nature of the packet . . ." At 1315. But in my view Agent Overbaugh did not have probable cause, which is a considerably lower hurdle than "absolute proof." The agent had a mere suspicion. There is an essential constitutional significance to the difference between probable cause and mere suspicion when it comes to intrusions by law enforcement officials into cars and packages. *See United States v. Clark, supra,* 531 F.2d 928. That in my view is the reason the Supreme Court in *Sibron, supra,* reached opposite results in determining the legality of two searches, approving one based on

probable cause, disapproving one on mere suspicion.

Moreover, I note that the result in *Blake* has been made questionable by the Supreme Court's decisions in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) and *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), which as the majority recognizes would open up the question of "whether the expectation of privacy attends a particular container" (such as a purse). At 1315 n.7. (Of course a finding of such an expectation of privacy would not prevent a limited intrusion such as seizure of the purse, required in exigent circumstances to avoid destruction of evidence, while law enforcement officials obtained a warrant *upon probable cause* to search it. *See Chadwick* and *Sanders, supra.*)

**7.** The majority suggests that the "clearly erroneous" standard for review of factual determinations by the district judge applies to the district court's conclusion that the plain brown envelopes was of an obviously incriminating nature. At 1315 n.7. Even under this standard I would hold the district court erred, because it is clear that an innocent appearing object is not incriminating from its mere appearance. But I do not think the "clearly erroneous" standard applies because I think the error is one of law, not fact. As a matter of law the plain view doctrine applies where the agents directly observe incriminating objects, not where the agents suspect a package contains incriminating evidence.

The majority's application of the "clearly erroneous" standard to the plain view issue seems to me somewhat inconsistent with the majority's discussion of probable cause which does not apply the "clearly erroneous" standard to the factual findings below. "The quantum of information which constitutes probable

*United States v. Berenguer*, 562 F.2d 206 (2d Cir. 1977); *United States v. Robinson*, 535 F.2d 881 (5th Cir. 1976); *United States v. Shye*, 473 F.2d 1061 (6th Cir. 1973). *Cf. United States v. Diaz*, 577 F.2d 821 (2d Cir. 1978) (incriminating nature of paper bag obvious when bag was found by agent stuffed into toilet tank).

The contrary conclusion reached by the majority is, of course, attractive, for the DEA agents did intercept dangerous narcotic drugs through enforcement activity that was routine in the sense of being accomplished without excessive force or obviously unseemly conduct. But "[a] search prosecuted in violation of the Constitution is not made lawful by what it brings to light." *Byars v. United States*, 273 U.S. 28, 29, 47 S.Ct. 248, 71 L.Ed. 520 (1927). *See also United States v. Di Re*, 332 U.S. 581, 594–95, 68 S.Ct. 222, 228–229, 92 L.Ed. 210 (1948).

> A rule protective of law-abiding citizens is not apt to flourish where its advocates are usually criminals. Yet the rule we fashion is for the innocent and guilty alike. If the word of the informer . . is sufficient to make the [present] arrest legal, his word would also protect the police who, acting on it, hauled the innocent citizen off to jail.

*Draper v. United States, supra*, 358 U.S. at 314–15, 79 S.Ct. at 333–334 (Douglas, J., dissenting).

My analysis of the probable cause question also leads me to believe that the statements obtained from appellant after his arrest should also be suppressed as fruits of an unlawful arrest. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States, supra*, 371 U.S. at 484–87, 83 S.Ct. at 415–417. Although the government argues that the agents did not

put appellant under arrest on October 2 until after he gave a statement disclaiming knowledge of the narcotics, the agents clearly seized petitioner when they forced him to leave his car for a pat down, confiscated the car pursuant to the arrest of Biggles when narcotics was discovered, induced appellant to accompany them to the courthouse, gave him *Miranda* warnings, and interrogated him in order to decide whether to file a complaint. *See Dunaway v. New York, supra*, 442 U.S. at 212–14, 99 S.Ct. at 2256–2257. All this was done to appellant without probable cause to arrest him. After appellant denied knowing anything about the narcotics, the agents filed a formal complaint against him and told him he would have to appear before a magistrate. The agents considered appellant to be under arrest from the filing of the complaint on October 2, until October 5, when at preliminary examination the magistrate dismissed the complaint for lack of probable cause.

In the meantime, on October 3, the agents once again spoke with appellant and used the complaint, which was pending, to induce him to make a further statement. Agent Thornton testified on cross-examination by Robert Wright, appellant's attorney at trial:

> A. Well, I asked him that—on October 3rd if he'd assist us, if he wanted to indicate to us that Mr. Biggles was receiving these capsules rather than himself; and he said something like, well, he didn't want to be a snitch, or something like that.
>
> Q. Well, isn't it a fact that on October the 3rd he did say that, "I made an investigation, and these capsules came from an individual in Kansas City"? Didn't he tell you that?

---

cause . . . must be measured by the facts of the particular case." *Wong Sun v. United States, supra*, 371 U.S. at 479, 83 S.Ct. at 413.

I find a similar inconsistency in the majority's assertion, "All parties concede that the packet was within the plain view of Agent Overbaugh." At 1314. Yet the majority does not mention the government's concession that

no probable cause existed at the time appellant's car was stopped. Moreover, I do not think anyone claims that the brown envelope was visible until Agent Overbaugh purposefully looked into appellant's car. Agent Overbaugh testified that he did not see the packet at the time Biggles made his "furtive gesture."

A. He said a guy by the name of Big Boy would bring them up, who drove a white Cadillac, something like that.

Q. Is that when he told you he wasn't going to be a snitch, when he told you about this Big Boy and that they came from Kansas City?

A. Well, I asked him if he could assist us further than just general information, such as Big Boy and that, and then he said it after that, when I asked him if he could assist us further.

Although the complaint against appellant was dismissed for lack of probable cause, an indictment subsequently was obtained on the drug charges;[8] Agents Thornton and Overbaugh arrested appellant on October 25. Before the agents informed appellant of his rights under the *Miranda* decision and before the agents interrogated him, he offered a statement that the narcotics seized from Biggles had been in a type of capsule not available in the local area. It is difficult to think of a more direct response to Agent Thornton's October 3 request for more information. That request drew its force from appellant's October 2 arrest, found later by a magistrate to have lacked probable cause. The agents thereby used the arrest without probable cause to lever from appellant his self-incriminating statement, relied upon by the prosecution as a lynchpin of its case.[9]

Because in my opinion the October 2 and 25 statements were fruits of an unlawful arrest, I would not reach the issue of whether appellant's October 25 statement was voluntary. I note, however, that the record contains a psychiatric report stating that appellant is emotionally disturbed and would, under stress, suffer an abnormally diminished capacity to reason. The majority fails to address this critical factor in its discussion of voluntariness. "[D]eterminations of voluntariness are based upon assessment of all the circumstances and factors surrounding the occurrence when the statement was made. . . . The 'totality of circumstances' inquiry requires the reviewing court to investigate and analyze 'both the characteristics of the accused and the details of the interrogation.'" *United States v. Grant*, 622 F.2d 308, at 316 (8th Cir., 1980), *citing Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). *See also Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). *See generally* Dix, *Mistake, Ignorance, Expectation of Benefit and the Modern Law of Confessions*, 1975 Wash.U. L.Q. 275; Frano, *Voluntariness, Free Will and the Law of Confessions*, 65 Va.L.Rev. 859 (1979).

Accordingly, I would reverse appellant's conviction.

---

8. Additional evidence became available to the government subsequent to the complaint; Biggles testified against appellant at his trial but did not do so at the October 5 preliminary examination. We are not informed what evidence was presented to the grand jury.

9. Don Nickerson, the Assistant United States Attorney who prosecuted the case, stated in his closing argument:

> [I]f I were in Columbo or if I were Sherlock Holmes, or even Dr. Watson, if I were looking at this case from a pure common sense investigative prospective, the one piece of evidence that would push me over that hump . . ., coupled with Biggles' testimony, is the fact that on October 2nd the Defendant knew nothing about the dope. Then all of a sudden on October 25, without talking to the DEA, the only people who knew about the rarity of the capsules, besides the source of the capsules, the Defendant all of a sudden had knowledge.
>
> If he didn't get the knowledge from the DEA, Willard Sanders got the knowledge from the person from whom he got the dope.